1 | Warren Paul Beck, State Bar #98908
Attorney at Law
2 | 3111 Camino Del Rio N., Suite 400
San Diego, CA 92108
3 | (619) 271-9933
Fax (619)271-9352
4 | E-Mail: wb@warrenbecklaw.com

5 | Attorney for Plaintiff, ANTHONY J. PARKER

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/11/2022** at 09:05:39 PM
Clerk of the Superior Court
By Aida Cruz,Deputy Clerk

6

7

8 | **SUPERIOR COURT OF CALIFORNIA**

9 | **COUNTY OF SAN DIEGO-CENTRAL DIVISION**

10

11 | ANTHONY J. PARKER,
an individual,

12 |          Plaintiff

13 | vs.

14 | 

15 | WELLS FARGO BANK,
NATIONAL ASSOCIATION,
16 | a United States corporation; and
DOES 1-100, inclusive,

17 |          Defendants.

18

19

20

21

22

23

Case No.   37-2022-00017898-CU-OE-CTL

GENERAL JURISDICTION

COMPLAINT FOR DAMAGES FOR:

1. VIOLATION OF CALIFORNIA FAIR
   EMPLOYMENT AND HOUSING ACT
   (RACE DISCRIMINATION)
2. VIOLATION OF CALIFORNIA FAIR
   EMPLOYMENT AND HOUSING ACT
   (DISABILITY DISCRIMINATION)
3. VIOLATION OF CALIFORNIA FAIR
   EMPLOYMENT AND HOUSING ACT
   (RETALIATION)
4. VIOLATION OF CALIFORNIA FAIR
   EMPLOYMENT AND HOUSING ACT
   (HARASSMENT)
5. VIOLATION OF CALIFORNIA FAIR
   EMPLOYMENT AND HOUSING ACT
   (FAILURE TO PREVENT DISCRIMINATION)
6. WRONGFUL TERMINATION IN
   VIOLATION OF PUBLIC POLICY

24 | Plaintiff ANTHONY J. PARKER alleges as follows:

25 | 1. Plaintiff ANTHONY J. PARKER (hereafter "PARKER") was at all times

26 | mentioned herein a resident of the County of San Diego, State of California, and who

27 | suffered damages as an employee of Defendants while employed in said County.

28 | 2. Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION (hereinafter

1

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

1   "WELLS") was at all times mentioned herein a corporation organized and existing under the

2   laws of the United States of America and whose address of its Chief Executive Officer is 420

3   Montgomery Street, San Francisco, California 94104. Said Defendant is licensed to do

4   business in said County of San Diego to transact the business of banking and finance.

5   ///

6        3. Plaintiff is informed, believes and thereon alleges that Defendants DOES 1

7   through 100 were in some manner responsible for the act and injuries complained of herein

8   and were at all relevant times representatives, employees, agents, and/or directors of

9   Defendants and/or in some type of business relationship with Defendants. Plaintiff is

10   ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100,

11   inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will seek

12   leave to amend this complaint to allege the true names and capacities of the DOE Defendants

13   when ascertained.

14        4. Plaintiff is informed, believes and thereon alleges that each of the Defendants was,

15   at all times relevant to this action, the agent, employee, representative, director and/or joint

16   venturer of the remaining Defendants and was acting within the course and scope of that

17   relationship and/or some other type of business relationship with Defendants. Plaintiff is

18   further informed, believes and thereon alleges that each of the Defendants herein gave

19   consent to, ratified, and/or authorized the acts alleged herein as to each of the remaining

20   Defendants.

21        5. Parker began employment with WELLS on September 13, 2010, in Phoenix, Arizona

22   as a Consumer Loan Underwriter for conforming mortgages and FHA Certifications. His

23   beginning salary was approximately $67,000.00 annually. He was hired by Underwriting

24   Manager Wayne Erickson who was also his initial supervisor.

25        6. In December of 2012, PARKER transferred to the San Diego branch named Wells

26   Fargo Home Mortgage located at 10421 Wateridge Circle, San Diego, CA 92121. This was

27   his last worksite and his responsibilities increased to include underwriting VA loans in 2014

28   and received certification to underwrite non-conforming loans in 2017. At the time of his

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

1    wrongful termination effective May 22, 2020, he concentrated on underwriting non-
2    conforming loans.

3        7. At the time of his termination, PARKER's base salary was $106,000.00 annually
4    with a bonus of $1,000.00 to $2,000.00 per month. His last supervisor who also terminated
5    him was Charlotte Pino, Underwriting Manager. She was only his supervisor for less than
6    eight months.

7        8. On May 21, 2020, PARKER, while working remotely due to the pandemic, texted
8    Ms. Pino that he was blocked from the system and the IT department could not help him. In
9    response, he was directed to call into a conference call.

10        9. The conference call attendees included PARKER, Ms. Pino, Dan Eason, and possibly
11    Mr. Eason's supervisor, Shanine Johnson. During this conference call, Ms. Pino informed
12    PARKER that a decision was made to let him go. When PARKER asked the reason for the
13    termination, Ms. Pino replied "performance" and she would e-mail him documentation. Ms.
14    Pino never sent PARKER the documentation.

15        10. PARKER sincerely believes that the actual cause for his termination is discrimination
16    based on race (African American) and disability (back injury) as well as retaliation. Ms. Pino
17    is non-African-American).

18        11. PARKER's last Performance 365 form for 2019 includes ratings and comments for
19    his mid year evaluation dated 8-30-2019 by his then supervisor Kamee` Tejero as well as for
20    his final evaluation dated 12-20-2019 by his last supervisor Charlotte Pino.

21        12. An examination of Performance 365 form shows a wide disparity in the evaluation
22    of PARKER which makes him appear as if he was two different persons depending on who
23    was doing the evaluating. The time between the mid year evaluation by Ms.Tejero and the
24    final evaluation was less than four months.

25        13. For example, Ms. Tejero writes on page eight, ongoing performance feedback
26    Mid Year 2019 Evaluation "Anthony thank you for the great job on working with our internal
27    sales partners to deliver the great customer service. You demonstrate a high level of integrity
28    and you bring a positive impact to our team. Thank you for always assisting whenever needed

1  and demonstrating great communication skills." 8/30/2019

2      14. In the same section for Year-End-2019-Evaluation, Ms. Pino writes less than four

3  months later, "Anthony has been placed on a formal warning for conduct and performance.

4  He disregards communication from leadership and his tone is perceived to be disrespectful....

5  Anthony has not demonstrated the ability to uphold the visions and values of the

6  organization. He has not met the behavioral expectations of a team member of Wells Fargo".

7      15. Under the section for Success Criteria, page 12, Ms. Tejero writes "This is excellent

8  and reflects your hard work and continued communication with both the internal and external

9  sales partners help you in being successful". 8/30/2019

10     16. In the same section for Year-End-2019-Evaluation, page 13, Ms. Pino writes less

11  than four months later, "Anthony did not effectively manage to risk. He demonstrated

12  disregard fo the organizations policies and procedures. "He was placed on corrective action

13  in December 2019 and is being monitored to ensure adherence to policies and procedures."

14     17. Yet just less than four months prior on 8-30-2019, Ms. Tejero writes on page 16,

15  "Anthony thank you for the great job in managing your pipeline and getting through all

16  of the loans assigned to you in a timely manner. Thank you for being engaged with your sales

17  and processing partners. Meeting customers' expectations can be difficult during our current

18  environment. Your ability to obtain a quick answer on a file helps the customer experience."

19     18. All underwriters with the authority to do so had the option of telecommuting up

20  to three days a week. Ms. Pino without just cause revoked this option given to PARKER.

21  The revocation took place just after he was moved to Ms. Pino's team. Mr. Eason and Ms.

22  Pino knew that PARKER depended on this option to manage his medical issues. Mr. Eason

23  instructed PARKER to obtain a certification from his doctor that this special accommodation

24  was needed. The other underwriters in his department were not required to obtain medical

25  certification as a pre-requisite for this accommodation for the telecommute option. He went

26  through the entire process and was ultimately approved.

27     19. Subsequently, on October 29, 2019, Charlotte Pino e-mailed PARKER (with copy

28  to Dan Eason) memorializing a meeting they had to discuss accommodations for back injury.

1   The e-mail gave PARKER an ultimatum that he could only continue using the telecommute

2   option if he agreed to discontinue his pursuit of upscaling and further training to achieve a

3   higher level of underwriting authority.

4       20. PARKER then immediately forwarded Ms. Pino's ultimatum to Human Resources

5   as he believed the ultimatum was not only unfair but discriminatory as it was not imposed

6   on any other employee that was similarly situated. He received a response from the

7   Accommodations Human Resources person named Jennifer who agreed with him and

8   suggested he file a claim with Employee Relations as a possible violation of the Americans

9   with Disabilities Act.

10       21. PARKER did follow Jennifer's suggestion and filed an Employee Relations claim

11   and the case was assigned to Human Resources Representative Dacy Riley. Davy Riley

12   assessed the case, concluded it was meritorious and escalated it to the next level.

13       22. PARKER then spoke with Human Resources Representative Nicole Williams

14   whose mission was to further investigate his claim and attempt to reconcile the claim with

15   management. One possible resolution was to transfer him to another team.

16       23. PARKER further alleges that as a result of this investigation by Human Resources,

17   he was immediately retaliated against by Charlotte Pino and Dan Eason. For example, Ms.

18   Pino  had written him up for several frivolous, false, and unsubstantiated claims that he

19   disputed. PARKER  communicated these disputes to Nicole Williams who agreed the write

20   ups were retaliatory and sent the case to the next level where the claims were reviewed by

21   Peter Simon.

22       24. Peter Simon communicated with PARKER several times regarding his claims

23   including issues with PARKER's last performance evaluation. Although Mr. Simon

24   concluded that most of the allegations in the write ups against PARKER by Ms. Pino were

25   discredited, Mr. Simon did not make any further conclusions as to the retaliation claims prior

26   to PARKER's termination.

27       25.  On November 8, 2019, Charlotte Pino e-mailed PARKER (with copy to Dan

28   Eason) that his start time of 9:30 a.m. was an approved temporary adjusted hours for personal

5

1 reasons and never meant to be long term. Effective November 12, 2019, he was expected to
2 return to his regularly scheduled hours of 9:00 a.m. to 6:00 P.M. Monday through Friday.

3      26. PARKER sent Ms. Pino an e-mail reply the same day stating that the 9:30 a.m.
4 start time makes it easier to deal with his medical issues and has been his schedule for seven
5 years prior to her being his supervisor. He stated others come in at 9:30 a.m. and asked her
6 if she is requiring him to have his doctor add this change to his notes.

7      27. On November 8, 2019, PARKER then sent an e-mail to Dacy Riley in Human
8 Resources asking for help in dealing with Ms. Pino who he believed was targeting him. He
9 wondered if he could be moved to a different manager.

10      28. On November 12, 2019, Charlotte Pino e-mailed PARKER asking him why there
11 is no decisioner logic on a loan that he issued a commitment letter on. She added in part that
12 he was putting the organization and the customer at risk by not following policy and
13 procedures. She concluded that if he cannot do his job due to medical or other reasons, than
14 he should work with accommodations, reach out to EAC or leave management.

15      29. PARKER e-mailed Ms. Pino the same day that the file was submitted inaccurately
16 by sales so his original decision logic needs to be updated. He corrected CORE, is in contact
17 with LO regarding high ratios with the update and his ensuing writeup will be based in that
18 direction. He expressed concern to her that she is always looking to find fault with him, that
19 he always included logic in his notes, and she brings up his medical condition in a negative
20 light which adversely affects him. This condition does not hinder him from doing his job.

21      30. On November 21, 2019, PARKER e-mailed Ms. Pino (with a copy to Dan
22 Eason)recapping a meeting he had with her. The e-mail stated in part " You mention my
23 telecommute was never revoked but I still have the e-mails from when it was. If you
24 remember I had to burn/waste several PTO days due to you revoking my telecommute where
25 I should have been able to work from home...if I were afforded the same benefits and
26 opportunities of my peers. Yet initially I was basically informed I no longer have a
27 telecommute option, no further specifics (unprecedented)." He added that "Without you
28 attempting to initiate dispute for my test case as I requested, as any other manager on the

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

floor would have done for me, you had my event closed with no further explanation or communication aside from "you need my support, there is no dispute…your event is closed," "We should also clarify that when this decision was made by yourself I had been on your team for less than a month…however I have over 2 years in the department with zero errors in audits."

31. The e-mail then referred to a second conversation where he stated "however (post HR involvement), an ultimatum given was clearly test case to advance or telecommute option for your health…no additional specifics, no in between. I still have the e-mail detailing that as well if needed. And now you have since presented somewhat of a guideline to what appears amounts to an action plan I'm being placed on for failing the test case (unprecedented). "

32. PARKER then describes to Ms. Pino disparate treatment by adding "We were able to establish in the meeting yesterday that this move, of additionally requiring me to be onsite for my entire time in the knowledge builder process, deviates from the normal process of Underwriters, whom currently already have lending authority, attempting (voluntarily myself) to upskill. Even if this is your planned procedure moving forward, we have established that I am the first in the department imposed with this potential new (unpublished nor even verbally alerted) process and requirement. "

33. PARKER then further expands on why he feels disparately treated: "We've also established this is your personal decision however, to impose this additional requirement for myself, yet the most concrete benefit and reasoning you have provided to this requirement, is that "I need the face to face contact with you." We discussed that you have had some success in test cases, and some failed test cases on your team…as there has also been success, and failed test cases on the non-conforming side. There are no numbers provided that substantiate or accurately factor one method vs the other. From what I have gathered however, from my current teammates mentioned in our discussion, there is no additional perceived benefit that you personally provided which required them to be face to face (even with them having no authority and learning an entirely new product, unlike

1    myself).”

2          34. PARKER further discusses why he feels Ms. Pino is discriminating against

3    him based on disability and why he needs a reasonable accommodation-" So where I have

4    a broader knowledge and experience with the product and my personal job function, and I

5    can just as easily (maybe more easily) ask and receive information via phone,e-mail, or IM

6    if/when needed (likely directly from a Lending Officer knowledgeable in NC product as

7    oppose to thru middle party), as the process has been for everyone else (with authority)… you

8    are stating that I specifically, need to have your face to face presence to be successful.”

9          35. PARKER then gives more examples of disability discrimination and Ms. Pino's

10   failure to reasonably accommodate him as follows: " On top of this… already a deviation

11   from the norm, you as my manager, new to this department assessing my skillset (me being

12   on team less than a month…however zero QIS findings in over 2 years in department, very

13   few errors in all audits thru my 10 year career with WF as an UW)…on top of all this, I have

14   obtained medical documentation…just for this matter specifically, at the suggestion of

15   management…that further substantiates that a medical "accommodation" (accommodation

16   in quotes as this has been required for myself only…no one else in my position has ever

17   needed as this onsite requirement was never imposed on previous UWs with authority

18   attempting to upskill)…I obtain and submit documentation…which is approved.”

19         36. PARKER then describes how Ms. Pino is unreasonably denying him a reasonable

20   accommodation of which he is qualified: " You then, personally, still decide that this is not

21   enough. Still…if I wish to proceed in obtaining a higher authority and advance, I personally

22   still need to follow this other, new, deviation from the normal process…which requires your

23   "face to face" interaction in order for me to be successful. You then, personally, still decide

24   that this is not enough. Still…if I wish to proceed in obtaining a higher authority and

25   advance, I personally still need to follow this other, new, deviation from the normal

26   process…which requires your "face to face" interaction in order for me to be successful.

27         37.  PARKER concludes by summarizing the unreasonableness of Ms. Pino's

28   disparate treatment of him based on his disability and her adverse employment action against

him vis a vis the performance improvement plan that threatens his employment as follows:

"I so require this extra face to face support from you, that not only does it necessitate this new process for me specifically to be present in the office at all times during the knowledge builder process (unlike my peers before me)… according to your expertise of the product and assessment of my skillset …my need for your face to face interaction even supersedes any medical conditions I have, that may be helped with or require an "accommodation" (again, accommodation required for myself only, as nobody else has ever needed accommodation for what I'm requesting)…obtained, approved (medical documentation)…and you are personally still denying…as I still would require face to face interaction with yourself in order to be successful. And so I alone am being asked to make a career decision that entails enduring additional and, in my humble opinion, unnecessary physical pain and everything else that it brings, in order to appease your personal onsite requirement for me specifically, if I want to advance, with no concrete logic aside from "need for face to face," as the support for your claims. I personally, even with medical documentation advising against, am having this unprecedented hurdle placed in my path of advancement. Otherwise, if I do accept the previous liberties of all of my peers (for documented health reasons for myself however), I cannot advance until adherence to the personal action plan developed by yourself for myself. Does this correctly sum it up? Please let me know what I am leaving out regarding the upskill process we discussed…or if I have mischaracterized anything. Please respond via e-mail so as to document."

38. Because he did not receive a satisfactory response from Ms. Pino, PARKER asked for an investigation on February 11, 2020, and dealt with Peter Simon, Senior Employment Investigator for Wells Fargo. Mr. Simon e-mailed PARKER on February 26, 2020, he wanted to provide him an update regarding PARKER's concerns. Mr. Simon states " Initial research was completed and there is sufficient information from that process and your report to warrant further investigation. I am committed to looking at the facts of this case objectively and want to assure you the process will remain confidential. Information related to your concern will be disclosed only to those with a business need to know and

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

governmental authorities when permitted by law." Mr. Simon concludes by stating:" I have attached a memo which confirms my understanding of your concerns which we discussed on February 11, 2020. Would you please carefully review this memo. If you have any questions about this memo, or if you have any clarification and/or additional information to provide, please contact me by the end of the business day Friday February 28, 2020. Otherwise, I will proceed with the review, which I anticipate to be concluded in 4-6 weeks."

39. In response to Mr. Simon's e-mail, PARKER e-mailed him on March 1, 2020, clarifying his position as to discriminatory and retaliation actions taken against him by Ms. Pino as follows: "Yes sir, I do believe I have experienced inequitable treatment in several ways for several months now. I did fail a test case in which just submitting clarifications/disputes regarding my write up for said test case should have and would have at the very least been attempted by any other manager on the floor. Charlotte refused to support me…giving no valid reasoning even during the test case process. "

40. PARKER then continued to explain how and why Ms. Pino retaliated against him as follows: "There was a clear disdain for me early on in being added to her team. Early I did note my files being mismanaged unfairly (I still have e-mails if needed) and maybe me saying something there triggered this backlash…but there was obvious contempt early on in my experience from Charlotte. With the failed test case she did revoke my telecommute option which was unprecedented…especially considering I was the one volunteering and pushing to test case and upscale just prior to being moved to her team. There has still been no valid reason provided." "I did then have to obtain a medical accommodation just to receive the same amenities already provided to my peers…whom had this without the accommodation. Yes, after accommodation was obtained my manager Charlotte Pino then, unlawfully based on ADA alone in my humble opinion, placed a new set of unprecedented hurdles in my path to hinder further advancement…in direct contrast to my medical accommodation, and not required by anyone else (still have the e-mails if needed)." "After I filed a complaint with employee relations, yes Charlotte then retaliated by issuing 2 formal write ups for performance and conduct. EVERY point in the write ups are fabricated and/or

grossly mischaracterized. These were clearly items in which Charlotte was looking for incidents to try and write me up. No explanation was provided to me when issued…just the statement that it had "already been approved by HR, and I could contact employee relations with any concerns." The instances of "misconduct" are completely subjective at best but can easily be disputed logically and rationally not only by myself but I believe by my peers and the facts as well. The issues of performance are 100% unwarranted. There is no substance or logic behind the write ups. Additionally in the few months since write ups were issued there have been no "weekly follow up meetings" to the "action plan" as outlined in the write up to "correct the action," …because it was a non-issue to begin with. This was complete retaliation and an attempt to at least shut me up." "There were no set of circumstances leading up that required coaching…this non-issue Charlotte fabricated into being a potential liability. I explained on every file why I logically did what I did, or placed notes when I placed them. There was never any issue that arose on any file that required Charlotte to review. However even with the critiques that were erroneously made, I did change my underwriting noting process as soon as addressed in order to try to appease her…again though, with no rhyme or reason as there was never any issue that arose to incite this…and this to the detriment of the customer in my humble opinion. Even then, this still somehow lead to a formal warning with no further provocation." " I do take pride in that I typically get along with and can work well with any and every one. I believe I'm typically liked by my peers. I take pride in my work and evaluations. I do invite any inquiries to review any/every annual and/or semi-annual evaluation I've had in my 13 year career with the WFHM & WFHE (combined) as an Underwriter leading up to now. I have never been written up or have any negative marks from any manager…ever. There is an evident and striking contrast in the way my current manager views and treats me from everyone else. "

41. Then PARKER goes on to explain how he has been damaged economically and emotionally as follows: "My time under Charlotte has also cost me financially in lost overtime and additional income opportunities over these past few months, that I was not afforded as my peers were (I still have emails if needed). I have been made to use/lose

1   unnecessary PTO days in prior months dealing with issues that my direct peers have had
2   other avenues or options that were not afforded to myself as well. Still today in many
3   instances I am left completely in the dark. All of my peers to my knowledge have already
4   been provided updates on their annual review as well as bonus. I have received nothing. This
5   is to go into effect or be received next week. I fear that my MPP and annual bonus have
6   already been severely compromised due to these previous few months under Charlotte."
7   "Above all that this has been the most stressful past few months of my life. I am the proud
8   father of 3 and as you can imagine that is my #1 priority. This has caused a great deal of
9   undue stress upon my family in countless ways, as I wonder if I do have recourse or will even
10  have a job in the weeks to come. Several months have passed since I submitted concerns
11  regarding Charlotte with very little to no reprieve so far. As time goes on I do feel she is
12  more emboldened to commit whatever acts against my character that she wishes with no
13  regard or consequences in inaccuracies." "I'm so frustrated with the current situation. I still
14  today deal constantly with issues that I believe to be undue and unfair. As I am currently out
15  on bereavement... Where my wife's company is asking where they can send flowers and
16  offering accommodations if she needs to take any time, Charlotte initially does not even
17  respond to my notification until I later have to log onto the system to further follow up with
18  her to be sure message was conveyed. She then proceeds to give me issues on whether I can
19  use bereavement or have to use my own PTO...based on me logging on to get further
20  information...it's appalling." "I further cannot understand why I particularly am unfairly
21  being forced to deal with a clearly hostile environment. I have been in this  specific
22  department for almost 3 years and in that time have seen several accommodations made for
23  others, in far more trivial scenarios. "My current peers have voiced to me directly how easy
24  it was for them to be accommodated by Dan when they felt they were in an uncomfortable
25  work situation and merely asked for a change in manager. I can name several employees (Zar
26  Nazihi, Dana Burrows, Marta Plopper, Gayle Azares, Ruth Nguyen, Lourdes Hernandez...)
27  that were changed teams simply by requesting through Dan. In very little time
28  accommodations were made from all of these requests in these scenarios that I feel to be far

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

1  less egregious than my current. I am not sure why my situation does not get consideration but

2  it is blatant disparate treatment."

3         42. On March 3, 2020, PARKER e-mailed Peter Simon an additional grievance

4  based on his receipt of his 2019 performance review discussed infra. He stated " Charlotte

5  was "kind" enough to send me my MPP review while I was out on Thursday. I was afraid to

6  review it while I was out on bereavement as I knew it would pile on the stress. I did finally

7  review however and just as feared, it is grossly distorted in order to further damage my

8  character." "I have attached a copy in the event you have a chance to review MPP. The

9  claims on here for yearend review are far short of the truth, and completely unsubstantiated.

10  Please note the stark and obvious contrast between Charlotte's evaluation and that of my

11  previous manager, completed less than 4 months prior. Please note Charlotte was new to the

12  department and I had been here for years. Please please feel free to review EVERY

13  evaluation I've received in my WF career over the years...they will all sharply contradict

14  what Charlotte fabricated in just a few months...just as the MPP evaluation from January

15  thru August of 2019 does." "This is beyond frustration at this point. I'm certain this has

16  compromised my annual increase, and the bonus I'm scheduled to receive this week...that

17  I earned, and was counting on. Where my peers have been updated with that info, I'm left

18  in the dark. I'm not sure you are the right person to reach out to regarding this." " I do want

19  to report my additional grievances regarding the MPP review in relation to unfair evaluation

20  as well as the illegal hurdles Charlotte implemented in hindering my progress to advance."

21         43. Then PARKER concludes with "Is this something I should open another

22  investigation for? Please point me in the right direction. As always Mr. Simon, your time and

23  attention are greatly appreciated. Thank you sir...I look forward to hearing from you

24  hopefully soon."

25         44. Between May 21, 2020 and May 22, 2020 Ms. Pino and PARKER e-mailed each

26  other. The subject matter was the documentation that PARKER expected to receive from

27  Ms. Pino indicating the reasons for his termination. Ms. Pino stated what she sent him was

28  contact information for assistance and to have questions answered. PARKER requested that

1  Ms. Pino e-mail him the document with the reasons for termination. Ms. Pino denied she told

2  him that she had such a document. Ms. Pino referred him to "ER".

3      45. On June 18, 2020, PARKER e-mailed Ronald D. Allen, Employee Relations

4  Consultant for Wells Fargo requesting his personnel file. He was hoping it would shed some

5  light as he still did not receive any information as to why he was terminated. The subject line

6  of his e-mail is ER Dispute Case #12133257. There was no response from Mr. Allen.

7      46. On June 18, 2020, Peter Simon e-mailed PARKER that he was assigned to

8  research concerns that PARKER reported to Employee Relations. He wanted to set up a

9  meeting to get a complete understanding of PARKER's concerns and gave him potential

10  meeting times.

11      47. On June 18, 2020, PARKER replied to Mr. Simon by choosing the June 19, 2020,

12  1:30 EST time slot. He again requested a complete copy of his personnel file stating he still

13  has not received any specifics regarding his termination.

14      48. On June 18, 2020, Mr. Simon e-mailed Mr. Parker confirming the meet time and

15  stated "Wells Fargo does not provide copies of personnel records to team members."

16      49. During his employment with WELLS, PARKER experienced many incidents of

17  micro aggressions based on his race (African-American). For example, Dan Eason (site

18  manager) casually walked past a co-worker and PARKER, and mentioned they looked like

19  a couple of thugs standing on a street corner. PARKER's co-worker told PARKER that

20  comment had to be directed toward PARKER.  Another example was at a team  meeting

21  where Mr. Eason stated they should be more like Chick Fil A, instead of Popeye's while

22  actually going from a slide in the presentation of a Chick Fil A restaurant full of Caucasian

23  families sitting & nicely dining to a slide of several African Americans fighting outside of

24  a Popeye's restaurant.  A third example was when Mr. Parker would ask a question regarding

25  work and he would get a quick response and then a comment about how the Lakers are

26  doing. He did not complain at that time in the interest of expanding his qualifications as an

27  underwriter.

28      50. There was an incident that he did complain of which PARKER believes resulted

1   in retaliation and ultimately termination. The physical location of his seat was moved to be

2   directly in front of his manager, so that he could physically be watched throughout the day

3   and monitored as to who he spoke with or when he was leaving. He felt humiliated as the

4   implication was that he needed constant supervision as if he was a child. It was confirmed

5   with the administration that the only other employee in his department that this happened to

6   over the last few years was the only other African-American male in his department. The

7   underwriting department has about 70 to 80 employees.

8       51. PARKER expressed his concern regarding this disparate treatment to Dan Eason

9   who in turn transferred PARKER to Charlotte Pino's team where the systemic process of

10  terminating him began. Subsequently, PARKER suffered other inequities as detailed infra.

11  These inequities included a number of instances reported to HR including exploitation of

12  medical issues while creating new and unfair practices aimed directly and specifically toward

13  hindering his advancement and ultimately terminating him without cause.

14      52. PARKER filed a Complaint of Discrimination with the California Department of

15  Fair Employment and Housing (DFEH) on February 1, 2021.

16      53. PARKER requested and thereafter received a right to sue letter from DFEH dated

17  February 1, 2022. Said right to sue letter is attached hereto as Exhibit "A" and incorporated

18  by reference as if fully set forth.

19                        **FIRST CAUSE OF ACTION**

20                  (RACE DISCRIMINATION IN VIOLATION OF FEHA)

21      54. Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through

22  53 of this Complaint as if fully set out.

23      55. The California Fair Employment and Housing Act (FEHA) protects the right of

24  all persons to seek, obtain, and hold employment without discrimination based on race. (See

25  California Government Code sections including but not limited to section 12940 (a).

26      56. Defendants have violated FEHA by disparate treatment of Plaintiff based on his

27  race (Caucasian) as alleged more specifically in paragraphs 49-52 of this Complaint.

28      57. As a proximate result of Defendants' conduct, Plaintiff has suffered harm,

                                    15

1  including lost earnings and other employment benefits, humiliation, embarrassment, and

2  mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to

3  be proven at trial.

4       57a. Defendants committed the acts alleged herein maliciously, despicably,

5  fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an

6  improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights.

7  Plaintiff is thus entitled to recover punitive damages from the Defendants and each of them,

8  in an amount according to proof.

9      57b. PARKER has incurred and continues to incur legal expenses and attorneys'

10  fees. Pursuant to Government Code section 12965(b), PARKER is entitled to recover

11  reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

12  **SECOND CAUSE OF ACTION**

13  (DISABILITY DISCRIMINATION IN VIOLATION OF FEHA)

14      58. Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through

15  57b of this Complaint as if fully set out.

16      59. The California Fair Employment and Housing Act (FEHA) protects the right of

17  all persons to seek, obtain, and hold employment without discrimination based on disability.

18  (See California Government Code sections including but not limited to section 12940 (a).

19      60. Defendants have violated FEHA by disparate treatment of Plaintiff based on his

20  disability (back injury) as alleged more specifically in paragraphs 18-41 of this Complaint.

21      61. As a proximate result of Defendants' conduct, Plaintiff has suffered harm,

22  including lost earnings and other employment benefits, humiliation, embarrassment, and

23  mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to

24  be proven at trial.

25      61a. Defendants committed the acts alleged herein maliciously, despicably,

26  fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an

27  improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights.

28  Plaintiff is thus entitled to recover punitive damages from the Defendants and each of them,

1  in an amount according to proof.

2  61b.  PARKER has incurred and continues to incur legal expenses and attorneys'

3  fees.  Pursuant to Government Code section 12965(b), PARKER is entitled to recover

4  reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

5  **THIRD CAUSE OF ACTION**

6  (RETALIATION IN VIOLATION OF FEHA)

7  62.  Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through

8  61b of this Complaint as if fully set out.

9  63.  The California Fair Employment and Housing Act (FEHA) protects the right of

10  all persons to seek,  obtain, and hold employment without adverse retaliatory treatment by

11  the employer for complaining about discrimination in the workplace. (See   California

12  Government Code sections including but not limited to section 12940 (a).

13  64.  Defendants have violated FEHA by adverse retaliatory  treatment of Plaintiff

14  based on his complaints of discrimination in the workplace  as alleged more specifically in

15  paragraphs 20-44 of this Complaint.

16  65. As a proximate result of Defendants' conduct, Plaintiff  has  suffered harm,

17  including lost earnings and other employment benefits, humiliation, embarrassment, and

18  mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to

19  be proven at trial.

20  65a. Defendants committed the acts alleged herein maliciously, despicably,

21  fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an

22  improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights.

23  Plaintiff is thus entitled to recover punitive damages from the Defendants and each of them,

24  in an amount according to proof.

25  65b.  PARKER has incurred and continues to incur legal expenses and attorneys'

26  fees. Pursuant to Government Code section 12965(b), PARKER is entitled to recover

27  reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

28  ///

---

17

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

## FOURTH CAUSE OF ACTION

(HARASSMENT BASED ON RACE/DISABILITY IN VIOLATION OF FEHA)

66. Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through 65b of this Complaint as if fully set out.

67. The California Fair Employment and Housing Act (FEHA) protects the right of all persons to seek, obtain, and hold employment without harassment by the employer in the workplace based on race. (See California Government Code sections including but not limited to section 12940 (j)(1) .

68. Defendants have violated FEHA by the harassment of Plaintiff in the workplace based on his race and disability as alleged more specifically in paragraphs 11-51 of this Complaint.

69. As a proximate result of Defendants' conduct, Plaintiff has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to be proven at trial.

69a. Defendants committed the acts alleged herein maliciously, despicably, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from the Defendants and each of them, in an amount according to proof.

69b. PARKER has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), PARKER is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

## FIFTH CAUSE OF ACTION

(FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF FEHA)

70. Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through 69b of this Complaint as if fully set out.

71. At all times herein mentioned, FEHA, Government Code section 12940(k), was

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

in full force and effect and was binding on defendants. This statute states that it is an unlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

72. During the course of PARKER's employment, Defendants failed to prevent their employees from engaging in intentional actions that resulted in PARKER being treated less favorably because of PARKER's protected status (i.e., his race and disability). During the course of PARKER's employment, Defendants failed to prevent their employees from engaging in unjustified employment practices against PARKER in such protected classes. During the course of PARKER's employment, Defendants failed to prevent a pattern and practice by their employees of intentional discrimination and harassment on the bases of race, and disability. PARKER believes and on that basis alleges that his race and disability were substantial motivating factors in Defendants' employees' discrimination against and harassment of him.

73. As a proximate result of Defendants' conduct, Plaintiff has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to be proven at trial.

74. Defendants committed the acts alleged herein maliciously, despicably, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from the Defendants and each of them, in an amount according to proof.

75. PARKER has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), PARKER is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

## SIXTH CAUSE OF ACTION

(WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY)

76. Plaintiff PARKER realleges and incorporates by reference paragraphs 1 through

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

75 of this Complaint as if fully set out.

77.  The California Fair Employment and Housing Act (FEHA) protects the right of all persons to seek,  obtain, and hold employment without discrimination based on race and disability (Government Code section 12940 (a) et sq.) and without retaliation for reporting discrimination in the workplace (See  California Government Code sections including but not limited to section 12940 (j)(1) ).

78. The FEHA embodies fundamental, substantial, and well established public policies of the State of California. In terminating Plaintiff PARKER, Defendants violated the fundamental, substantial, and well established public policies embodied in FEHA.

79. As a proximate result of Defendants' conduct, Plaintiff  has  suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, all to his damage in an amount in excess of $25,000, the actual amount to be proven at trial.

80. Defendants committed the acts alleged herein maliciously, despicably, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and a conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover  punitive damages from the  Defendants and each of them, in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PARKER prays for relief as follows:

### FOR THE FIRST CAUSE OF ACTION

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For attorney fees pursuant to the California Fair Employment and Housing Act;

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

6. For costs of suit incurred; and

7. For such other and further relief as the Court may deem just and proper.

**FOR THE SECOND CAUSE OF ACTION**

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For attorney fees pursuant to the California Fair Employment and Housing Act;

6. For costs of suit incurred; and

7. For such other and further relief as the Court may deem just and proper.

**FOR THE THIRD CAUSE OF ACTION**

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For attorney fees pursuant to the California Fair Employment and Housing Act;

6. For costs of suit incurred; and

7. For such other and further relief as the Court may deem just and proper.

**FOR THE FOURTH CAUSE OF ACTION**

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For attorney fees pursuant to the California Fair Employment and Housing Act;

6. For costs of suit incurred; and

7. For such other and further relief as the Court may deem just and proper.

**FOR THE FIFTH CAUSE OF ACTION**

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For attorney fees pursuant to the California Fair Employment and Housing Act;

6. For costs of suit incurred; and

7. For such other and further relief as the Court may deem just and proper.

**FOR THE SIXTH CAUSE OF ACTION**

1. For back pay, front pay, and all other special damages according to proof;

2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;

3. For punitive damages as allowed by law;

4. For prejudgment interest;

5. For costs of suit incurred; and

6. For such other and further relief as the Court may deem just and proper.

///

///

///

///

1

## JURY TRIAL DEMAND

2        Plaintiff PARKER hereby specifically demands trial by jury.

3

4

5   Dated: May 10, 2022

6                                        Warren Paul Beck, Attorney for Plaintiff
7                                        ANTHONY J. PARKER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

COMPLAINT FOR DAMAGES FOR RACE DISCRIMINATION

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                      GAVIN NEWSOM, GOVERNOR

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

February 1, 2022

**Via First Class Mail**

Anthony Parker
c/o Warren Beck
PO Box 212950
Chula Vista, CA 91921

RE:  **Notice of Case Closure and Right to Sue**
**Case Number:** 202010-11430002
**Case Name:** Parker / Wells Fargo Bank et al.
**EEOC Number:** 37A-2021-01162-C
**County of Violation:** San Diego

Dear Anthony Parker:

The Department of Fair Employment and Housing (DFEH) has closed your case for the follow-
ing reason: **Insufficient Evidence**. The DFEH makes no determination about whether further
investigation would establish violations of the Fair Employment and Housing Act (FEHA) or
other laws. This decision does not mean the alleged claims have no merit or that the respondent
is in compliance with the law. No finding is made as to any other issues that might be construed
as having been raised by this complaint.

**This is your Right to Sue notice.** As specified in Government Code section 12965, subdivi-
sion (b), you may file your own civil action asserting employment claims under the FEHA within
one year of the date of this letter. If you want to file a civil action that includes other claims, you
should consult an attorney about the applicable statutes of limitation.

Your complaint **is dual filed** with the United States Equal Employment Opportunity Commission
(EEOC). You have a right to request EEOC to perform a substantial weight review of our
findings. This request must be made within fifteen (15) days of your receipt of this notice.
Pursuant to Government code section 12965, subdivision (d) (1), your right to sue may be tolled
during the pendency of EEOC's review of your complaint. To secure this review, you must
request it in writing to the State and Local Coordinator:

**EEOC Southern California**
**Roybal Federal Building**
**255 East Temple Street, 4th Floor**
**Los Angeles, California 90012**
**Karrie.Maeda@eeoc.gov**

You have the right to appeal the decision to close your case. This request must be made within
ten (10) days of receiving this letter. Your appeal must include: 1) a summary as to why you dis-
agree with the case closure; and/or 2) any new detailed information (e.g., documents, records,
witness information) that supports your claim. If you appeal, the information you provide will be
carefully considered. You may appeal this decision by:

- Email. Send your request to appeals@dfeh.ca.gov and make reference to the case #:


PLAINTIFF'S EXHIBIT A

**Notice of Case Closure and Right to Sue**
**February 1, 2022**
**Page 2 of 2**

202010-11430002.

- Mail. Send your request to: DFEH Appeals Unit, 2218 Kausen Drive, Suite 100, Elk Grove, CA 95758. Include a copy of this letter and make reference to the case #: 202010-11430002.

- Phone. Call us at 800-884-1684 (voice), 800-700-2320 (TTY), or by using California's Relay Service at 711.

Although the DFEH has closed this case, the allegations and conduct at issue may be in violation of the law. You should consult an attorney as soon as possible regarding any other options and/or recourse you may have regarding the underlying acts or conduct.

Below are some resources to assist you in deciding whether to bring a civil action on your own behalf in court in the State of California under the provisions of the FEHA against the person, employer, labor organization or employment agency named in your complaint. To proceed in Superior Court, you should contact an attorney.

- The State Bar of California has a Lawyer Referral Services Program which can be accessed through its website at www.calbar.ca.gov under the "Public" link, or by calling 866-442-2529 (within California) or 415-538-2250 (outside California).

- Your local city or county may also have a lawyer referral or legal aid service.

- The Department of Consumer Affairs (DCA) has a publication titled "The Small Claims Court: A Guide to Its Practical Use" online at www.dca.ca.gov/publications/small_claims. You may also order a free copy by calling the DCA Publication Hotline at 866-320-8652, or by writing to them at: DCA, Office of Publications, Design and Editing, 1625 North Market Blvd., Suite N-112, Sacramento, CA 95834.

Sincerely,

*Sandhya Panda*

Sandhya Panda
Associate Governmental Program Analyst
(916) 582-6934
sandhya.panda@dfeh.ca.gov

Cc:    Wells Fargo Bank
       c/o Kristina F Brown
       Mail Code S4104-142
       100 W. Washington Street, Suite 1418, Floor 14
       Phoenix, AZ 85003

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO** | *FOR COURT USE ONLY* |
|---|---|
| STREET ADDRESS:      330 West Broadway | |
| MAILING ADDRESS:   330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA  92101-3827 | |
| BRANCH NAME:        Central | |

| PLAINTIFF(S):    Anthony J Parker |
|---|
| DEFENDANT(S): Wells Fargo Bank National Association |
| SHORT TITLE:     PARKER VS WELLS FARGO BANK NATIONAL ASSOCIATION [IMAGED] |

| **STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER:<br>37-2022-00017898-CU-OE-CTL |
|---|---|

Judge: Carolyn Caietti                                                    Department: C-70

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐  Mediation (court-connected)                              ☐  Non-binding private arbitration

☐  Mediation (private)                                             ☐  Binding private arbitration

☐  Voluntary settlement conference (private)            ☐  Non-binding judicial arbitration (discovery until 15 days before trial)

☐  Neutral evaluation (private)                                ☐  Non-binding judicial arbitration (discovery until 30 days before trial)

☐  Other (*specify e.g., private mini-trial, private judge, etc.*): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: *(Name)* _____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                   Date: _____

_____                            _____
Name of Plaintiff                                                        Name of Defendant

_____                            _____
Signature                                                                  Signature

_____                            _____
Name of Plaintiff's Attorney                                       Name of Defendant's Attorney

_____                            _____
Signature                                                                  Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  05/12/2022                                                    _____
                                                                               JUDGE OF THE SUPERIOR COURT

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:    330 W Broadway
MAILING ADDRESS:    330 W Broadway
CITY AND ZIP CODE:    San Diego, CA 92101-3827
DIVISION:    Central
TELEPHONE NUMBER:    (619) 450-7070

PLAINTIFF(S) / PETITIONER(S):    Anthony J Parker

DEFENDANT(S) / RESPONDENT(S):    Wells Fargo Bank National Association

PARKER VS WELLS FARGO BANK NATIONAL ASSOCIATION [IMAGED]

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | CASE NUMBER: 37-2022-00017898-CU-OE-CTL |
|---|---|

## CASE ASSIGNED FOR ALL PURPOSES TO:

Judge:  Carolyn Caietti                                        Department: C-70

**COMPLAINT/PETITION FILED:** 05/11/2022

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 10/14/2022 | 09:45 am | C-70 | Carolyn Caietti |

**Due to the COVID-19 pandemic, all Case Management Conferences (CMCs) are being conducted virtually unless there is a court order stating otherwise.** Prior to the hearing date, visit the "virtual hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC. (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal. Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):
- **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint. An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint. A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed. If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
- **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
- **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6). If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date. See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged. The court encourages and expects the parties to consider using ADR options prior to the CMC. The use of ADR will be discussed at the CMC. Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

---

SDSC CIV-721 (Rev. 04-21)      **NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL)**      Page: 1

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases. Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing. E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court. All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program." This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain. The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150. Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION**

CASE NUMBER: 37-2022-00017898-CU-OE-CTL        CASE TITLE: Parker vs Wells Fargo Bank National Association [IMAGED]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
        (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
        (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_
        (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

**Potential Advantages and Disadvantages of ADR**
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

**Most Common Types of ADR**
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.  Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

<u>Local ADR Programs for Civil Cases</u>

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

<u>On-line mediator search and selection:</u>  Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005).  The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience.  Refer to SDSC Local Rules <u>Division II, Chapter III</u> and Code Civ. Proc. <u>§ 1141.10 et seq</u> or contact the Arbitration Program Office at (619) 450-7300 for more information.

<u>More information about court-connected ADR</u>: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:**  The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:**  To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

<u>Legal Representation and Advice</u>

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Warren Paul Beck, Attorney at Law, State Bar #98908<br>3111 Camino Del Rio N., Suite 400, San Diego, CA 92108<br><br>TELEPHONE NO.: (619) 271-9933   FAX NO. *(Optional):* (619) 271-9352<br>E-MAIL ADDRESS: wb@warrenbecklaw.com<br>ATTORNEY FOR *(Name):* Plaintiff ANTHONY J. PARKER | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**05/11/2022** at 09:05:39 PM<br><br>Clerk of the Superior Court<br>By Aida Cruz,Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **SAN DIEGO**
STREET ADDRESS: **330 W. Broadway**
MAILING ADDRESS: **same**
CITY AND ZIP CODE: **San Diego, CA 92101**
BRANCH NAME: **Central Division-Hall of Justice**

CASE NAME:
Anthony J. Parker vs. Wells Fargo Bank, National Association; Does 1-100

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 37-2022-00017898-CU-OE-CTL |
| | | | JUDGE:   Judge Carolyn Caietti<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [x] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):* Six
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 11, 2022

Warren Paul Beck
_____
(TYPE OR PRINT NAME)

► *Warren Paul Beck* (signature)
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2